Case number 15-5753, Javon Marshall, et al. v. ESPN, et al. Argument not to exceed 15 minutes for the plaintiffs, 15 minutes to be shared by defendants. Mr. Zarellick, you may proceed. Good morning, Your Honors. May it please the Court, I'm Stephen Zarellick from Nashville, Tennessee, here on behalf of the college athletes. I'd like to reserve three minutes for rebuttal. You may. We seek complete reversal of the Rule 12b-6 dismissal. There is nothing amateur about the business of big-time college football and basketball. Defendants make billions of dollars on the backs of these college athletes, giving the economic benefit of the athletes' performances to themselves and depriving the athletes of that benefit. They give it to everyone else but the athletes, the performers. The facts in the law in this case compel fair compensation for these athletes. This is an idea whose time has come. We seek reversal because Tennessee's common law right of publicity has never been abrogated by statute and the common law has no sports broadcast defense. Nor does it seem to have been recognized in Tennessee courts. Yes. Nor has it been recognized by any other court, to my knowledge, any other state court. Is that correct? Your Honor, the O'Bannon decision recognized it. State courts? Your Honor, in terms of, you're correct, let me address that. Sure. Tennessee state courts have not explicitly said that there is a right for athletes and at the same time it has not excluded them and there is no exception for them. The exception for athletes is found under the statute's very narrow sports broadcast defense. I understand your argument. It's not even clear to me that the Tennessee courts have recognized a common law right of publicity. Let me jump to that, Your Honor. I want to just tell you the arguments I plan to make. The first is that the common law was not abrogated. The second is that the first... It has to have been there before it can be abrogated. I'll jump right to that. Let me tell you. There is a common law right of publicity under Tennessee law. It was first recognized in 1977 by the Sixth Circuit in the Factors case. So it's a federal court sort of interloping in Tennessee law. The Tennessee common law has also been recognized after enactment of the 1984 statute. It's the Tennessee Personal Rights Protection Act of 1984. And since that time, we know that the common law, the pre-existing common law, was not abrogated for two reasons. The first reason is because Tennessee state courts have continued to recognize it after 1984. That was in 1987 in the Elvis Presley International Memorial Foundation v. Crowell decision. And it was also in 2006 in the Polygram v. Legacy decision. The second way that we know that it was not abrogated, this pre-existing common law, is because the Tennessee Supreme Court has told us how the common law is abrogated. And it cannot be abrogated by implication. I mean, I guess we're kind of... At least I'm kind of talking past you a bit on this. Because there is, as I understand it, and I just want to make sure I'm not making a mistake, there is no Tennessee case prior to the enactment of this statute that recognizes any Tennessee common law right of publicity. Correct? I disagree, Your Honor. What is the Tennessee state court case that recognizes it? Well, the Tennessee common law was recognized by Judge Merritt in the Sixth Circuit case. Again, I'm looking for... I agree with you, Your Honor. We don't create the Tennessee common law. We might try to divine it, but we don't create it. What Tennessee court or Tennessee case created this right that you're relying upon, I think throughout your case, before the Tennessee legislature acted in the way they did? Well, the way that we know, let me tell you, Judge Koch from the Tennessee Court of Appeals in 1987 in the Crowell decision discusses the pre-existing common law before the enactment of the 1984 statute. That's how we know. So there isn't a case, but you think there's a case after the statute that... There's a case after the statute. ...retroactively suggesting that there had been this right. Well, I would disagree that it's retroactively suggesting it. I would say that he recognizes that it's embodied in Tennessee's constitution. This is not just created by the courts. It's embodied in Tennessee's constitution. He explains how it is an expansive right, and he explains...he does touch on the factors decision from the Sixth Circuit, but he says that is evidence that this was pre-existing the statute. The statute takes out a slice of the common law. It provides expansive rights in some cases for a narrower statute in some cases. The example is that the military are entitled to trouble damages and attorney's fees under the statute. There's no similar remedy under the common law. Yes, we maintain that the common law was not abrogated. I guess it would be helpful to just confirm what your claim is, your theory, and tell me if this is correct. Your theory is that players have a right to... they have a property right in the appearance of their image in reference to their names in broadcasts of team sporting events in which they participate as a player. Is that correct? Let me articulate it a little bit differently. What's wrong with that? I think it is a little bit narrower than what I'm saying. Our position is that these college athletes, like every other individual, this court and ETW recognize that the right of publicity is an inherent right belonging to every human being. I'm trying to get away from rhetoric to something specific that I can understand legally. Let me tell you specifically. These college athletes, our position, is that the law supports the relief we want. They have a right of publicity under Tennessee's common law, which was not abrogated by statute, and there is no sports broadcast under common law, number one. Number two, the defendants are hiding behind the First Amendment. This is just not responsive to what I'm... Ask me again. I want to answer your question. I'm trying to nail down what is the putative right that you're asserting here. It seems to be, to me, a property right in the appearance of these players in reference to their names during broadcasts. It's broader than that. It's not in reference to their names. How so? It's their performance, just like Zucchini, the human cannonball. It's their performances and images. It's not just reference to their names. It's the complete, the whole thing. Right, well, that's the appearance, but I think... It's not just the appearance. So we maintain that the defendants' use of their images and their performances, capturing it and broadcasting the entire thing, deprives them of the First Amendment protection. It falls squarely under Tennessee's common law. They are commercially exploiting the names, images, and likenesses. So nobody could broadcast a team sports event unless they get licenses from each of the players to have that broadcast. Is that correct? Just like in Zucchini, we are not seeking to enjoin the broadcast. We're seeking compensation. It would be helpful if you could just answer my question rather than kind of talk about something a little bit different. It seems that your theory is that they cannot broadcast unless they get a license or some other kind of permission from your clients, from the players, to show these things that we just discussed. And I'm trying to answer your question with as much respect as possible. My answer is we are not trying to enjoin their broadcast, and they may continue to broadcast it. We're seeking compensation. We are seeking authorization and consent ahead of time. You want to sell a license, right? Yes. You think that they need a license? We do. Yes, Your Honor. Okay. That's a pretty remarkable proposition, wouldn't you say? I would disagree. I think that it's a case of first impression, but I wouldn't call it remarkable. They have a right under Tennessee common law, like they do under many other states. The sports broadcast exception, actually, is in the minority. If you look at the defendants say that... But no other state recognizes a right of publicity in sports broadcast to begin with, so how could that be a minority view? But the sports broadcast defense is the exception. We're looking at it differently. I'm saying that's carving out an exception, and you're saying let's start with the sports broadcast defense. The fact that it hasn't been recognized, Tennessee's common law continues to evolve. The Crowell decision specifically says that. If we're looking at what do Tennessee state courts do? You would agree that we would have to perform some of that evolution here in order for you to... I mean, I read your brief. You've got a section on it evolves, and we should be some of the forces of evolution here. Actually, I'm responding to the defense. When they say that I can't point to any affirmative authority, common law, you don't always have to point to affirmative authority. I'm not asking you to evolve the law. I'm asking you to find that the exception that they say exists under statute doesn't exist under common law. That's what I'm asking you to do. I'd like to turn to the First Amendment. I'm happy to go wherever you want me to go if you have questions. The First Amendment does not protect these defendants because Zucchini is directly on point. Like the athletes in our case, Mr. Zucchini was a human cannonball. That was his performance. They broadcast his entire performance. They say it was only 15 seconds, and I say exactly. That was 15 seconds. These are hours of performances. The Supreme Court noted the economic right that belonged to the individual performer and how broadcasting this without his consent and without pay was unjust enrichment to them. And it said there was no First Amendment violation here because the media could continue to broadcast it. They just had to pay for it. I want to turn to the false endorsement claim for a second. That's the Lanham Act claim? The Lanham Act claim. The district court reached the ultimate conclusion that belonged to the jury. He conducted no analysis that's required by this court, the eight-factor test, on likelihood of confusion. Sometimes you don't have to do all eight factors to see what the right answer is. I mean, so your theory here is that if a player for Michigan lines up to kick a field goal and there's a banner on the bottom for Tostitos or something, that a reader might be confused as to whether the field goal kicker is endorsing Tostitos. Much broader than that, Your Honor. We are not. Much broader than that. It's not limited to the Tostitos ad. It's the entire broadcast, the advertisements for the broadcast, and the advertisements for the unrelated products. These players... Even the sports advertising? Even the advertising that just says, upcoming is the Michigan football game? Sure. That's confusing. The players' images and likenesses would be confused because they're endorsing the upcoming performance of their own game? It falsely implies, Your Honor, that these players have endorsed this entire system, which they have not. We have alleged, and the facts must be read in the light most favorable to us, we've alleged that they have not consented to this. And if you think about it, just your common experience... It's confusing. So the confusion is that they've endorsed ESPN or something? Sure. And if you look at commercial speech about brand loyalty and brand awareness, the Jordan versus Jewell decision, for example, this court in Lidochem and Simcoe has taken a much broader, expansive view of commercial speech. It's not just that which proposes a commercial transaction. It's also that which promotes brand loyalty for these defendants. Our players... Everyone else in the system... Did you allege that? We did. Did you allege that they're appearing to endorse the Netflix themselves? We... Not with that specificity, Your Honor. We did allege that it... We specifically talked about, in paragraphs 178 through 81, our complaint, we specifically talked about that this is promoting brand awareness for the defendants and their related and unrelated products. And I see my time is up. Thank you. Good morning, Your Honors. My name is Evan Chesler. I represent the broadcast and licensing defendants this morning. I've reserved 12 minutes. Mr. Fuller, who's here for the conference defendants, has asked for three minutes. That's okay. I would like to briefly make four points. I'll make them as briefly as I can, and certainly in less than 12 minutes. Number one, the statute in Tennessee is quite clear. It only applies to the use of name, image, or likeness in advertisements, and it has an explicit exception for use in connection with sporting broadcasts. This is a lawsuit about basketball players and football players being televised and playing their games. I can't imagine that there could be a clearer application of a particular statute to particular conduct than that, and so I don't think there is very much to say about the statute. The statute plainly covers, as the district court found, plainly covers these sporting events. It also, by the way, to answer Judge Levy's question, it covers ads about the sporting event. If there's an ad that says at 10 o'clock the Michigan game is going to be on Channel 2, that's in connection with the sporting event. To say that the ad is not protected but the game is seems to me to be a difficult proposition. Second point, there is no case, as Judge Kethledge pointed out, no case. We've looked high and low. There is no Tennessee case that says or suggests in any way that there was a common law right of publicity for sports broadcasts. There just isn't. The Elvis Presley litigation that counsel was talking about, that had to do with putting Mr. Presley's name on a corporate door. That's a completely different situation. We're talking about a situation where the statute makes it very clear what it covers and what it doesn't cover, and as Your Honor said also, this myth that we're somehow suggesting an abrogation of common law, I couldn't agree more. In order to abrogate something, it had to have existed before. It didn't exist before. We're not asking for any abrogation. We're asking for an application of what the Tennessee Supreme Court said in the Lavin case in 2002. Even if there were some common law authority, which there isn't, if there's some kind of a conflict between a statute and the common law, the statute prevails. That's what the Supreme Court of Tennessee said in Lavin. There's no conflict here, however, because the statute is shadow boxing against nothing. There is no common law right. That takes me to my third point. My third point is the antitrust claim. Counsel talked about the First Amendment. We can talk about the First Amendment if the court wants, but it really has nothing to do with the four points I want to make today because we don't need to get there. The antitrust claim, you need, I've tried a lot of antitrust cases in my life. I've litigated dozens of them. It's horn book law that you must have a plaintiff with an injury in fact and a plaintiff who has sustained the particular type of injury called antitrust injury, an injury that flows from injury to competition. First, there cannot be an injury in fact here if you've been deprived of a nonexistent right. That's the Mickey Rooney case in the Second Circuit. He said as a child actor he had a right of publicity. The studios conspired to deprive him of the right. Second Circuit said no antitrust violation. So you would think then that the Sherman Act claim is ultimately derivative of the Tennessee state law claims, whether it's statutory or common law. Yes, Your Honor. And that if those fall, then there is no property that has been, I forget the words used in the Act itself, property harmed by the strain or the activity and then that's it. Exactly, Your Honor. I mean the Lujan case in the United States Supreme Court says an injury in fact is, quote, an invasion of a legally protected interest. So you can get to the interesting question of antitrust injury. There isn't any. They don't even attempt to allege an injury to competition here. Counsel mentioned the O'Bannon case. The O'Bannon case, the district court itself said the competition among the networks to broadcast these games is intense. That's what my clients do. They broadcast these games. So there's no even allegation of an injury to competition. So that takes me to my last point. My last point is the Lanham Act claim. Now in the Lanham Act situation, I think, again, the law is pretty clear. The question is whether or not there is a viable claim for confusion here. And counsel, as I think he explained to the court in his remarks, their allegation is that there's some confusion or risk of confusion that these athletes are endorsing something. Well, it can't be that they are believed to be endorsing products. There's not a single instance they allege none, there is none, where any of these athletes shows up and says, buy a Nike pair of sneakers. Nothing like that. There's no use of the athletes in any ads here. What they're talking about is advertisements for the games themselves, which are covered by the statute, or, and they didn't even allege this in the complaint, they put it up in the courtroom during the argument. It's not in the complaint. A banner ad. It's not at the district court motion to dismiss argument. Yes, I argued for our side there, and counsel for the plaintiffs put up a TV screen, they showed a computer screen, they showed a banner ad, said something like, watch CSI at 8 p.m. while a young man was in the air throwing a ball into a basket. And the allegation is that people will be confused that that is an endorsement of the CSI program. Now, they keep talking about this ETW case, but they cite the dissent, and I just want to read one passage from the majority opinion in ETW, where the court said, quote, we disagree with the dissent's suggestion that a jury must decide where the balance should be struck and where the boundary should be drawn between the rights conferred by the Lanham Act and the protections of the First Amendment. Your Honors, there are just some things that are obvious. Much as lawyers like to make much about little, and I apologize on behalf of the profession for that. That's why we're 4% of the gross domestic product, I suppose. The fact of the matter is, lawyers can't make, we're not alchemists. We shouldn't be in the business of making something of nothing. There is no one in his or her right mind who would believe that that young man who was jumping to put a ball in a basket was endorsing the CSI program. Any more than anyone would believe that if Mike Tyson's picture showed up on the news attending Muhammad Ali's funeral a few weeks ago, and an ad came across the bottom that said, watch 60 minutes at 7 p.m., that Mr. Tyson's endorsing a CBS program. That's the same example. So, again, there's nothing here. There's no Lanham Act claim. There's no Sherman Act claim. There's no right of publicity. The plaintiffs say that they seem to focus on the Lanham Act for their request that this case not be dismissed with prejudice, and they say in their brief that they want to amend that. They identify the Lanham Act and the misleading advertising component as what they want to amend. Right. Do you think that there's something that they could potentially allege? No, Your Honor, I don't, and I say that for two reasons. First is a very clear procedural reason, and the other one is a substantive reason. The procedural reason is embodied in this Court's decision in the Wingate case, 537 F. 3rd. 565. The Court said it is not an abuse of the discretion of a district court to dismiss a case with prejudice where the complaining party never sought leave to amend in the district court. This plaintiff never asked to amend this complaint, ever. Not before the motion to dismiss argument, not after. Therefore, I submit the district court was perfectly well within his discretion to do what he did. That's the procedural issue. The substantive issue is it would be futile. There isn't anything they can allege. There's nothing. There's never been a suggestion that these students are in fact running around actually advertising somebody's products. They can't allege that because it's not true. I mean, this case is bounded, if I understand the theory correctly, around sports broadcasts, team sports, I guess football and basketball, where players, the images of these players appear on screen as they're playing the sports. Precisely. And so the question is, could they conceivably allege any set of facts that would lead to the conclusion that someone thinks the field goal kicker is indeed endorsing Tostitos? That's the question. As I said before, sometimes lawyers just have to say, I can't make something of nothing. I respectfully submit the answer to that question is unqualifiedly no. And with respect to the right of publicity, their forum should be the legislature of the state of Tennessee, not the Sixth Circuit Court of Appeals. As they said in the Elvis Presley case, which they themselves cited, the legislature has spoken on this issue. They've defined the boundaries of the right. And that's what we're talking about here. And they can't dress this up as a Lanham Act case, to mix a metaphor. It isn't the Lanham Act case because there isn't any conceivable possibility of confusion, alleged or that could be alleged. And again, they'd have to come up and explain in their rebuttal why they didn't ask the district court for leave to amend the complaint. Why are they asking for a motion to amend to this court when they didn't make any effort to do that where it should have been made, which is to the district court. The court exercised its discretion appropriately. That's what Your Honor said in the Wingate case. And I think the matter is over. And I say I have two minutes and 50 seconds, but I shouldn't waste any time. If you have any questions, I'm happy to answer them. We do not. Thank you, Counselor. Thank you very much, Your Honors. May it please the Court, I'm Robert Fuller, Robinson, Bradshaw, and Henson for the Southeastern Conference and speaking on behalf of the conference defendants. I'll keep it very short. I agree with everything that Counsel for ESPN had to say. I want to make a couple of quick points. First, there's no Lanham Act claim alleged against the conference defendants, so whatever goes on with respect to the Lanham Act doesn't involve us. Secondly, I think Judge Ketledge hit the nail on the head. The fatal flaw in this entire case is the absence of any right of publicity in television broadcast. It would be completely unworkable. Such a right of publicity has never been recognized by any court, and it's certainly inconsistent with the Tennessee statute, which has a specific exclusion in it. In the absence of that right of publicity, there's no injury in fact, no antitrust injury. You can't have a conspiracy to deprive someone of a nonexistent right or be unjustly enriched by using a nonexistent right. It's the common fatal flaw throughout the entire case. There are other bases to affirm the district court, but really that's all your honors need to address. I want to speak specifically to the Zucchini case because the plaintiffs badly misconstrued that case. The issue in Zucchini was whether the First Amendment granted the broadcasters a right to telecast the entire Human Cannonball Act without the permission of the producer of that act. That's an entirely different question as to who owns the rights in that act, which was not certainly before the Supreme Court. In the Ohio Supreme Court, they said, we may assume that a right of publicity in yours here. It was clear that Mr. Zucchini had told the TV station that he didn't want them to do the broadcast, and they were claiming they had the right to do it anyway. We run into this in college sports sometimes when newspapers or TV stations think they have the right to broadcast the game without permission. It has nothing to do with the entire performance. It has nothing to do with the right of publicity. It's just that the First Amendment does not go so far as to give broadcasters a right to essentially take away the value of the broadcasting rights that have been long established in this country as belonging to the producer of the event. They can't misappropriate the recognized property rights of the broadcasters, etc., in these various broadcasts. That's right. The way it works is that whoever sponsors the event has the broadcast rights and can license those to the broadcaster, and that somebody can't come in and say, well, I want to show it for free, unless your honors have any questions. That's all I've got. We do not. Rebuttal? Rebuttal? Defendants are trying to say that everyone else in the world has a right of publicity except athletes, and especially college athletes. And this court need look no further than the Zucchini case to find that athletes have a right of publicity in their performances. Other authority? If you're asking about the preexisting common law right, Judge Koch, in that decision, he did affirm what Judge Merritt did from the Sixth Circuit in the Thatcher's case, saying that this preexisted the statute. Judge Trauger, in the Moore v. Weinstein case, which this lower court relied upon to say that the rights are coextensive in Tennessee, relied on the footnote in Gawk v. Karamian, footnote five. The authority there, if you have your law clerks look there, none of the three cases cited in footnote five in Gawk v. Karamian support the proposition that these are coextensive. One that they cite was even a 1969 case, 16 years before the enactment of the statute. Other cases that have followed Zucchini talking about athletes' rights of publicity in the context of a sports broadcast are Wisconsin Interscholastic v. Gannett, Seventh Circuit, 2011, and, of course, the abandoned case from the Northern District of California, April 2014. That decision also said that athletes have a right of publicity that the First Amendment cannot trump when the broadcasters broadcast the entire event. This dichotomy that my good friends representing the athletes point out about participant versus producer, that butchers Zucchini. Zucchini stands for the proposition that participants, individuals, that's who the right of publicity belongs to, not producers. How about like the coach and the assistant coach? Are you asking me if they have a right of publicity? They have to get a license from them too? They very well may, and those coaches and assistant coaches, the distinction is they are being paid, and these players are not. What about referees? I'm sorry? Do they have to get licenses from the referees? Their image is shown more clearly than a lot of people's. Let me tell you why I think that's a false concern, and that's because both the Lanham Act and the right of publicity, they are limited exclusively to those whose images have commercial value, and that would be the players in these cases. I have 42 seconds left. I'd like to also – I have coaches who won't like hearing that. No, but that's what I'm saying. We're talking about referees, Your Honor. I agree with you. I agree that the coaches, that's why they receive millions of dollars. What about a walk-on player? I mean, nobody even knows who he is. How does the broadcaster figure out whether they need a license from that player? Well, we're talking now about – we're getting into the remedy section here. What about my question? Well, can individuals versus – I don't know if the walk-on – Does the broadcaster have to get a license from a walk-on who doesn't travel? My argument would be yes, Your Honor. Our class proposes – we've named 10. We've specified the allegations in the opening paragraphs of our complaint about how their games were nationally televised. So our proposed class is of players who have commercial value. Yes. Thank you. Thank you, counsel. The case will be submitted. Clerk may call the next case.